## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **RAYMOND JAMES FINANCIAL SERVICES, INC., and RAYMOND JAMES & ASSOCIATES, INC.** | |
| Plaintiffs, | |
| v. | Case No. |
| **THE OHIO NATIONAL LIFE INSURANCE COMPANY; OHIO NATIONAL LIFE ASSURANCE CORPORATION; OHIO NATIONAL EQUITIES, INC.; and OHIO NATIONAL FINANCIAL SERVICES, INC.** | |
| Defendants. | |

## COMPLAINT

Plaintiffs Raymond James Financial Services, Inc. ("**RJFS**") and Raymond James & Associates, Inc. ("**RJA**") (RJFS and RJA are collectively referred to as "**Raymond James**") bring this action for injunctive relief and damages against Defendants The Ohio National Life Insurance Company ("**ONLIC**"), Ohio National Life Assurance Corporation ("**ONLAC**"), Ohio National Equities, Inc. ("**ONEQ**") (collectively, "**Ohio National**"), and Ohio National Financial Services, Inc. ("**ONFS**", and together with Ohio National, "**Defendants**").   In support, Raymond James states as follows:

## I.    INTRODUCTION

This is a straightforward case about an insurance company, Ohio National, that designed a product, promised to compensate financial firms like Raymond James (and those

firms' financial advisors) for selling that product, later determined it was losing money on that product, and then sought to minimize its losses by breaking its promise and refusing to pay the compensation it was contractually obligated to pay to the financial firms who had previously sold the product.

Ohio National sold certain variable annuity contracts that allowed policyholders to purchase, for an additional cost, a Guaranteed Minimum Income Benefit ("**GMIB Rider**") that guaranteed some level of income irrespective of the market performance of the underlying account value.  The GMIB Rider was attractive to clients, especially those nearing or in retirement, for its promise of a guaranteed minimum annual payment unaffected by market forces or account fluctuations.

Recognizing that financial firms such as Raymond James offered the ability to reach a large number of potential clients, Ohio National entered into selling agreements with Raymond James and other firms.  The selling agreements with Raymond James (i) memorialized Raymond James' duties in selling and servicing Ohio National products, (ii) memorialized the compensation that would be paid to Raymond James and the registered brokers that are either affiliated with or employed by it (the "**Financial Advisors**") for selling Ohio National's variable annuity products to Raymond James' clients and subsequently servicing those products, and (iii) provided guaranteed continued access to policy information for variable annuity products sold to Raymond James' clients.  RJFS signed a Selling Agreement with Ohio National in 2002 while RJA signed a Selling Agreement with Ohio National in 2003 (collectively, the "**Selling Agreements**").

The Selling Agreements unambiguously provided that Raymond James (and its applicable Financial Advisors) could select from several compensation options for selling and servicing Ohio National's products.  These options ranged from a single up-front lump sum payment to a recurring stream of smaller payments known as "**trail commissions**" that would continue until the applicable client's contract would be annuitized or surrendered.  By designing this compensation structure to incentivize most Financial Advisors to choose the trail commissions option, Ohio National was also able to defer payment of the majority of commissions and, in turn, avoid paying tens of millions of dollars in commission payments at the initial sale.

The Selling Agreements also unambiguously provided that Ohio National's payment of trail commissions on already-issued products would continue even if the Selling Agreements themselves were terminated, and they also guaranteed Raymond James continued access to policy information for "all products issued under this agreement" and sold to Raymond James' clients after the termination of the Selling Agreements that Raymond James had during the time the Selling Agreements were in force.

After nearly ten years of issuing GMIB Riders to thousands of Raymond James clients and paying corresponding trail commissions, Defendants came to the realization that GMIB Riders would be unprofitable **for Defendants** and took a number of steps to attempt to convince Raymond James' clients to exchange their GMIB Riders for products that in most cases were less advantageous for those clients, but in all cases would be financially beneficial for Defendants.

First, Ohio National instituted multiple "exchange offers" where it solicited Raymond James' clients to exchange their annuities with GMIB Riders for another annuity with a different rider.  After those offers found little acceptance, Defendants then decided -- without any warning -- to unilaterally terminate their Selling Agreements with Raymond James (and other broker-dealers) and solicit Raymond James' clients with a buyout offer.  Despite knowing of clear and unmistakable language in the Selling Agreements that contractually obligates Ohio National to pay trail commissions until the buyers of GMIB Riders annuitize or surrender their variable annuity contracts (the "Contracts"), Defendants decided they would prefer paying attorneys to defend their actions rather than continue paying what amounts to approximately $10 million in annual trail commissions to Raymond James (and its Financial Advisors) alone.  Equally as appalling, Defendants have taken the position that Raymond James (and its Financial Advisors) must continue servicing Raymond James' clients' Contracts even after Defendants' unilateral and unlawful decision to stop paying trail commissions. Unlike Defendants, Raymond James (and its Financial Advisors) have and will always put their clients' interests first and this dedication has not and will not be compromised despite Defendants' actions.  Defendants have taken these actions in violation of Raymond James' existing contractual rights under the Selling Agreements not only to directly conserve and make money but also to improve the odds that Raymond James' clients will consent to subsequent exchange or buyout offers for already-issued Contracts with GMIB Riders.

Defendants' actions are clear and willful breaches of the Selling Agreements and otherwise unlawful.  These actions have resulted in multiple lawsuits being filed against Ohio National by at least ten separate sets of broker-dealers and/or registered representatives

alleging breach of contract, quasi-contractual claims, and violations of state unfair and deceptive practices acts for the very same scheme that Ohio National employed against Raymond James. *See* **Exhibit 1**.

Raymond James brings this action seeking money damages from Defendants to compensate it for the economic injury and harm that it has suffered and will continue to suffer, including to its reputation and goodwill with clients, if Defendants are permitted to perpetrate their unlawful actions on Raymond James and Raymond James' clients. Raymond James also seeks injunctive relief to prevent suffering irreparable harm, including loss of goodwill, loss of reputation, and financial losses that are not presently calculable.

## II.    PARTIES

1.      Plaintiff Raymond James Financial Services, Inc., is a Florida corporation with its principal place of business at 880 Carillon Parkway, St. Petersburg, Florida 33716.

2.      Plaintiff Raymond James & Associates, Inc., is a Florida corporation with its principal place of business at 880 Carillon Parkway, St. Petersburg, Florida 33716.

3.      Both RJFS and RJA are wholly-owned subsidiaries of Raymond James Financial, Inc. ("**RJF**"), which also has its principal place of business at 880 Carillon Parkway, St. Petersburg, Florida 33716. RJF is not a party in this case.

4.      Defendant The Ohio National Life Insurance Company is an Ohio corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242. The Ohio National Life Insurance Company is a wholly-owned stock subsidiary of Defendant Ohio National Financial Services, Inc., which corporation has the same principal place of business as The Ohio National Life Insurance Company.

5.      Defendant Ohio National Life Assurance Corporation is an Ohio corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Life Assurance Corporation is a wholly-owned subsidiary of The Ohio National Life Insurance Company.

6.      Defendant Ohio National Equities, Inc., is an Ohio corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Equities, Inc., is a broker-dealer registered with the Financial Industry Regulatory Authority ("**FINRA**"). Upon information and belief, Ohio National Equities, Inc., is a wholly-owned subsidiary of The Ohio National Life Insurance Company.

7.      Defendant Ohio National Financial Services, Inc., is an Ohio corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Financial Services, Inc. is the parent of Defendant The Ohio National Life Insurance Company.

## III.     JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. RJFS and RJA are Florida corporations with their principal place of business in Florida.  The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc., are Ohio corporations each with a principal place of business in Ohio.  The amount in controversy, without interest and costs, exceeds $75,000.

9.      This Court also has personal jurisdiction over Defendants because they each engaged, directly or indirectly, in actions or conduct within this District and throughout Florida

and specifically have sold variable annuities, including with the GMIB Rider, and other insurance products in this District and throughout Florida on a regular and systematic basis.

10.     Defendants sell products to, and enter into contracts with, residents in this District and throughout Florida, including without limitation purposefully and knowingly selling a substantial number of variable annuities, including with GMIB Riders, to residents in this District and throughout Florida.

11.     Defendants conducted and solicited business in this District and throughout Florida, engaged in a persistent and wrongful course of conduct in this District and throughout Florida and/or derived substantive revenues from goods or services used in this District and throughout Florida, and engaged in actions and conduct which were targeted at and caused injury to Raymond James, and to residents, in this District and throughout Florida.

12.     Defendants have also sought and obtained licenses from Florida to write insurance in this District and throughout Florida.  Defendants solicit and advertise products to consumers and businesses in this District and throughout Florida.

13.     By carrying out regular business transactions with businesses and clients in this District and throughout Florida, Defendants purposefully availed themselves of the privilege of conducting activities within Florida, thus invoking the benefits and protections of its laws.

14.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(2), because Defendants are entities with the capacity to be sued in their common name and are subject to this Court's personal jurisdiction with respect to this civil action.

15.     Venue in this Court is also proper pursuant to 28 U.S.C. § 1391(b)(2) because, as detailed below, a substantial part of the events or omissions on which the claims are based

occurred in this District, the contracts underlying this case were executed by Raymond James in this District, and notice of the termination of the Selling Agreements were sent by Defendants to Raymond James in this District.

## IV. STATEMENT OF FACTS

### RFJS and RJA

16.     RJF is a holding company whose subsidiaries collectively form one of the country's largest full-service wealth management and investment banking operations outside of New York, and it is the largest such firm headquartered in Florida.  The firm has been headquartered in Florida since its inception in 1962.

17.     Its various subsidiaries, including RJA and RJFS, offer investment services to clients through Financial Advisors who are, as applicable, licensed and registered with FINRA, the U.S. Securities and Exchange Commission, and state insurance agencies.

18.     Raymond James has developed a strong industry reputation, and has generated significant goodwill through its commitment to both providing excellent client service and supporting and reasonably compensating Financial Advisors.  In part, Raymond James has done this by identifying and selecting high-quality financial products that can be sold by, and generate reasonable compensation for, Financial Advisors.

19.     Many of the financial products that Raymond James selects to make available to Financial Advisors for sale and servicing are created or offered by third parties, such as Defendants, with whom Raymond James enters into selling, servicing, or similar agreements.

20.     Raymond James' revenue and Financial Advisors' compensation are in many instances based on the commissions received from third parties for selling the third parties'

QB\62032163.6

financial products to Raymond James' clients and servicing those products once they have been sold.

21.     Among the Contracts that Ohio National issued that were sold by Raymond James (through Financial Advisors) were for "ONcore variable annuities." These Contracts came with the option of also buying GMIB Riders, and a substantial portion of the Contracts sold by Raymond James to Raymond James' clients included the clients' purchase of the optional GMIB Rider. A variable annuity is a contract sold by an insurance company (here, Ohio National) for which the client who buys it pays a lump sum premium to the insurance company. The contract allows the policyholder to choose between a pre-determined group of sub-accounts that are similar to mutual funds. If the policyholder also purchases the optional GMIB Rider, the policyholder has the option of "annuitizing" either the account value (as determined by the performance of the selected sub-accounts) or the GMIB Rider base. The GMIB Rider base grows by a minimum amount each year and is determined by the age of the policyholder and the length of time before the policyholder decides to "annuitize" the annuity. It can also be increased by the underlying performance of the sub-accounts. The purpose of the GMIB Rider is to give the policyholder a minimum amount of income for life no matter how the sub-accounts perform.

22.     As discussed above, these Contracts involve a compensation structure that allows the election of payment of trail commissions to Raymond James, a portion of which are subsequently paid by Raymond James to the Financial Advisors who sold the Contracts. And as already noted, a trail commission is deferred compensation, calculated based on both the premiums paid by the client and the earnings on those premiums, that is paid periodically by

the issuer of the product over the lifetime of the product.  For variable annuities, including those issued by Ohio National, the trail commission is paid until the annuity contract is annuitized or surrendered by the buyer.

23.     Ohio National derived a significant benefit by incentivizing Raymond James (and Financial Advisors) to elect the trail commission compensation structure with annual commission payments made over the life of the annuity rather than receiving a one-time commission at the time of sale.

**RJFS Enters Into a Selling Agreement With Ohio National in 2002**

24.     On or about August 26, 2002, RJFS and ONEQ, ONLIC, and ONLAC entered into a Selling Agreement (the "**2002 Selling Agreement**") which, in relevant part, memorialized Ohio National's agreement to compensate RJFS for its sale and service of certain variable annuity contracts issued by Ohio National (the 2002 Selling Agreement referred to them as "**Contracts**").  A copy of the 2002 Selling Agreement is attached as **Exhibit 2**.

25.     The 2002 Selling Agreement specifically provided that Ohio National "propose to have [RJFS's] registered representatives…solicit sales of the Contracts" and "hereby appoint [RJFS] to supervise solicitations of the Contracts, and to facilitate solicitation of sales of the Contracts which are described in the Schedule(s) of Commissions attached hereto."  *Id.* at 1.

26.     Pursuant to the 2002 Selling Agreement, RJFS was responsible for training, supervising, and licensing its representatives who sold Contracts.  *Id.* ¶ 5.  RJFS was also required to review all sales for suitability and to process and complete any accompanying paperwork.  *Id.* ¶ 7.

QB\62032163.6

27.     All premiums paid by clients on Contracts sold by RJFS (and Financial Advisors affiliated with RJFS) belonged to and were paid directly to Ohio National.  In turn, paragraph 9 of the 2002 Selling Agreement, titled "Commissions Payable," governed compensation payable to RJFS for the sale of Contracts and it specified that "commissions…shall be paid to [RJFS]...according to the Commission Schedule(s) relating to this Agreement…"  *Id.* ¶ 9.  Copies of various Commission Schedules relating to the 2002 Selling Agreement (the "**2002 Commission Schedules**") are attached as **Exhibit 3**.

**RJFS Financial Advisors Have A Choice On How They Are To Be Compensated**

28.     For certain products, the 2002 Commission Schedules permitted RJFS and Financial Advisors affiliated with it to choose from several commission payout options that varied as to the timing and amount of commissions.  These options ranged from receiving a larger lump sum commission at the time of the Contract's sale to receiving a smaller up-front commission with subsequent trail commissions, calculated based on the premium and any deferred earnings on it, paid over the life of the Contract.

29.     By way of example, a Financial Advisor who sold a Contract with a GMIB Rider offered by Ohio National under the 2002 Selling Agreement could choose between: (i) receiving a single 7% lump sum commission upon the sale of the Contract with no future trail commissions, or (ii) receiving an initial 1% commission plus additional annual 1% trail commissions every year the client continued to own the Contract (*i.e.*, every year until the client surrendered the Contract) and did not annuitize it.

QB\62032163.6

30.    The 2002 Commission Schedules provided, in relevant part, that "Trail commissions…will be paid on the quarterly anniversary, starting in the 15th month…." *See* Ex. 3.

31.    Neither the 2002 Selling Agreement nor the corresponding Commission Schedules indicated or insinuated that any Defendant had the unilateral right to terminate its obligation under the 2002 Selling Agreement to pay trail commissions on existing Contracts once the Contract was sold to a client.

<u>**RJFS Trail Commissions Survive Defendants'**</u>
<u>**Termination Of The 2002 Selling Agreement**</u>

32.    Indeed, the 2002 Commission Schedules unequivocally stated that "Trail commissions will continue to be paid to the broker dealer of record while the Selling Agreement remains in force **and will be paid on a particular contract until the contract is surrendered or annuitized**." *Id.* (emphasis added).

33.    The "Commissions Payable" provision in the 2002 Selling Agreement also contained a **survival clause** covering Ohio National's continuing obligation to pay trail commissions on outstanding Contracts even after termination of the 2002 Selling Agreement. The clause stated:

> **"The terms of compensation shall survive this Agreement unless the Agreement is terminated for cause by ONL, provided that [RJFS] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that [RJFS] remains the broker-dealer of record for the account."**

Ex. 2 ¶ 9 (emphasis added).

## <u>RJA Enters Into A Selling Agreement With Ohio National In 2003</u>

34.    On or around June 1, 2003, RJA and ONEQ, ONLIC, and ONLAC entered into a Selling Agreement (the "**2003 Selling Agreement**") which, in relevant part, memorialized Ohio National's agreement to compensate RJA for its sale and service of certain Contracts issued by Ohio National.  A copy of the 2003 Selling Agreement is attached as **Exhibit 4**.

35.    Like the 2002 Selling Agreement did for RJFS, the 2003 Selling Agreement called for RJA (and its Financial Advisors) to solicit sales of the Contracts and also tasked RJA with supervising "solicitations of the Contracts, and to facilitate solicitation of sales of the Contracts which are described in the Schedule(s) of Commissions attached hereto." *Id.* ¶ 1.

36.    The 2003 Selling Agreement also obligated RJA to train, supervise, and license its Financial Advisors who engaged in the sale of Contracts, including requiring that RJA review all sales for suitability and process and complete any accompanying paperwork. *Id.* ¶¶ 5, 7.

37.    Under the terms of the 2003 Selling Agreement, RJA (and its Financial Advisors) marketed and sold the Contracts to clients, and all of the premiums and annuity purchase payments belonged to and were paid directly to Ohio National.  In return, the 2003 Selling Agreement provided that RJA and its Financial Advisors would receive commissions to compensate them for their efforts.

38.    Paragraph 9 of the 2003 Selling Agreement, titled "Commissions Payable," provided that commissions payable to RJA in connection with Contracts "shall be paid to [RJA]...according to the Commission Schedule(s) relating to this Agreement…." *Id.* ¶ 9.

Copies of various Commission Schedules relating to the 2003 Selling Agreement (the "**2003 Commission Schedules**") are attached as **Exhibit 3**.[1]

### RJA Financial Advisors Have A Choice On How They Are To Be Compensated

39.    For certain products, the 2003 Commission Schedule permitted RJA (and its Financial Advisors) to choose from several commission payout options that varied as to the timing and amount of commissions.  These options ranged from receiving a larger lump sum commission at the time of sale to receiving a smaller up-front commission with subsequent "trail commissions," calculated based on the premium and any deferred earnings on it, paid over the life of the annuity contract.

40.    Neither the 2003 Selling Agreement nor the corresponding Commission Schedule indicated or insinuated that any Defendant had the unilateral right to terminate its obligation under the 2003 Selling Agreement to pay trail commissions on existing Contracts once the Contract was sold to a client.

### RJA Trail Commissions Survive Defendants' Termination Of The 2003 Selling Agreement

41.    The 2003 Commission Schedules provided, in relevant part, that "Trail commissions…will be paid on the quarterly anniversary, starting in the 15th month and will be calculated using the asset value on the anniversary less premium payments received in the last 12 months."  Ex. 3.

42.    The 2003 Commission Schedules also provided that "Trail commissions will continue to be paid to the broker dealer of record while the Selling Agreement **remains in**

---

[1] The 2002 Selling Agreement and 2003 Selling Agreement operated with the same applicable commission schedules given that the underlying products were the same.

**force and will be paid on a particular contract until the contract is surrendered or annuitized**." *Id.* (emphasis added).

43.     By way of example, for a hypothetical $300,000 Contract with a GMIB Rider, a Financial Advisor could choose between: (i) receiving a single 7% lump sum premium of $21,000 upon the sale of the annuity with no future trail commissions, or (ii) receiving an initial 1% commission of $3,000 and subsequently receiving an annual 1% trail commission of $3,000 for every year the client owned and did not annuitize or otherwise surrender the annuity.

44.     For various reasons, and as was contractually permitted, Financial Advisors typically declined the larger initial lump sum commission option in favor of receiving a smaller initial commission and subsequent trail commissions on any Contract sold to clients.  Indeed, Ohio National actively encouraged Financial Advisors to choose the trail commission payment option.  This benefitted Financial Advisors by generating a more stable stream of compensation rather than a one-off payment and by compensating them for continuing to advise clients about the clients' Contracts over the entire life of those Contracts.

45.     Notably, Ohio National reaped even bigger benefits from Financial Advisors' selection of trail commissions given that the payment of those trail commissions necessarily came from the client's premium payment.  Instead of being obligated to make a sizeable up-front payment to Raymond James from the client's premium payment, Ohio National was able to retain the vast majority of that premium by paying Raymond James a smaller initial commission and spreading out the remaining commission payments over years.

46.     Using the example in Paragraph 43 above, in that instance Ohio National would have retained nearly $20,000 more when the annuity was sold if the Financial Advisor elected

to receive trail commissions instead of a single up-front commission.  This up-front savings, multiplied across the universe of Contracts sold by Raymond James for which Financial Advisors elected trail commissions, was a substantial benefit for Ohio National in the form of tens of millions of dollars it did not have to pay up-front but rather could defer payment over many years.

47.     The 2003 Selling Agreement, like the 2002 Selling Agreement, contains a survival clause obligating Ohio National to continue paying trail commissions on already-issued Contracts even if the 2003 Selling Agreement was terminated.  That provision states:

> **"The terms of compensation shall survive this Agreement unless the Agreement is terminated for cause by ONL, provided that [RJA] remains a broker-dealer in good standing with the NASD and other state and federal regulatory agencies and that [RJA] remains the broker-dealer of record for the account."**

Ex. 4 ¶ 9 (emphasis added).

48.     Under both the 2002 Selling Agreement and the 2003 Selling Agreement, Ohio National was and remains contractually obligated to continue paying trail commissions on already-issued Contracts sold by Raymond James even after either agreement was terminated as long as (i) the termination was not for cause; (ii) RJA and RJFS, as applicable, remain broker-dealers in good standing with the applicable regulatory agency(ies), and (iii) RJA and RJFS, as applicable, remain the broker-dealers of record for the account.

49.     To date, neither Selling Agreement has been terminated for cause.  Further, both RJA and RJFS remain broker-dealers in good standing with the applicable regulatory agencies, including FINRA and the SEC.  And RJA and RJFS also remain the broker-dealers of record for thousands of clients that purchased Ohio National Contracts with GMIB Riders covered by

the Selling Agreements for which Ohio National has unilaterally elected to breach its obligation to continue paying trail commissions.

**<u>Ohio National Profits And Benefits From Raymond James' Business</u>**

50.     In or about 2003, Raymond James began selling Ohio National Contracts to clients.

51.     Ohio National, through the Selling Agreements, gained access to Raymond James, Financial Advisors, clients, and potential clients.

52.     The Financial Advisors' clients depend on them for sound, independent financial advice and to recommend suitable financial products in which to invest based upon each client's individual needs.  These clients typically depend on their Financial Advisors to provide advice over time.

53.     As such, Financial Advisors are currently continuing to advise clients and otherwise servicing multiple thousands of Ohio National Contracts for which Ohio National is obligated to pay to Raymond James trail commissions under the Selling Agreements.  While Defendants have unilaterally decided to stop paying trail commissions on those Contracts, they reaped millions of dollars in annual revenue from the sale of those Contracts and will continue to reap millions of dollars going forward by wrongfully withholding the payment of those trail commissions until the underlying Contracts annuitize or are surrendered.

**<u>The Ohio National Contracts Sold By Raymond James<br>Included Variable Annuities With GMIB Riders</u>**

54.     Among the variable annuity products issued by Ohio National and sold by Raymond James under the Selling Agreements was a class of variable annuities for which the client could elect to also buy a GMIB Rider.  In exchange for an additional annual fee (on top

of the premium for the underlying variable annuity), the GMIB Rider provides the client with a specified guaranteed minimum monthly income on the annuity regardless of how the financial markets or the underlying investments perform.   The amount of the income guaranteed by the GMIB Rider is the value of the underlying securities (the account value) or the guaranteed minimum income base that grows at a specific, guaranteed rate.

55.     In addition to promoting the benefits of GMIB Riders to Raymond James and Financial Advisors, Ohio National actively encouraged Raymond James and Financial Advisors to select the trail commission compensation option.  Ohio National represented to Raymond James and Financial Advisors that selecting the trail commission compensation option for the sale of GMIB Riders was in both their and their clients' best interests because the Financial Advisors would (i) be able to increase their book of business through these recurring annual payments and (ii) be paid for advising clients over the entire period they owned the GMIB Rider and associated annuity.

56.     Thus, if a combination of underperforming investments, contract fees, and income distributions causes a client's annuity account value to fall to zero, the GMIB Rider nonetheless obligates Ohio National to pay that client a specified level of guaranteed income for their lifetime.

57.     If income withdrawals cause the underlying account value to go to $0, Ohio National has to continue to make the GMIB Rider income payments from their general account.

58.     As Ohio National no doubt calculated when it created and offered the GMIB Rider, the underlying client annuity accounts were forecasted to increase to levels that would still make it profitable for Ohio National to pay the payments guaranteed by the GMIB Rider.

59.     Neither Raymond James nor any Financial Advisor played any part whatsoever in creating or pricing the GMIB Riders.

60.     The GMIB Riders were very popular with Raymond James clients seeking a product that delivered steady income and was not completely susceptible to market forces or volatility.  The product was especially popular with clients approaching retirement.

### After Realizing That GMIB Riders Are Unprofitable, Defendants Form A Scheme To Minimize Their Losses

61.     After nearly ten years and selling thousands of Contracts with GMIB Riders to Raymond James clients (and to many others), Defendants apparently determined that GMIB Riders were unprofitable for them.  But rather than simply halting the sale of any further GMIB Riders, continuing to abide by their contractual obligations, and accepting the consequences of their prior business decisions, Defendants embarked on a multi-step scheme to cut their losses further through unethical and unlawful means.

### Defendants Stop Selling GMIB Riders But Continue Allowing New Deposits To Existing GMIB Riders

62.     Upon information and belief, no later than 2012, Defendants determined that GMIB Riders were and would continue to be unprofitable for them.  As a result, they publicly announced that they would stop issuing any more GMIB Riders.  Thus, while Ohio National continued to issue new variable annuity contracts, buyers no longer had the option to also buy GMIB Riders.

63.     Despite deciding to stop issuing GMIB Riders no later than 2012, Ohio National continued paying trail commissions to Raymond James on outstanding GMIB Riders for another five-plus years.

QB\62032163.6

64.     Unlike other insurance companies, such as MetLife, that also had previously offered GMIB Riders but later decided to stop selling them, Ohio National was contractually obligated to continue to allow clients with Contracts with GMIB Riders to deposit additional funds into those annuities.  And Ohio National continued to pay additional commissions to Raymond James based on those new deposits.  In fact, Ohio National abandoned a plan announced in 2012 to stop allowing clients to add to their existing GMIB Riders. At no time did Defendants state or even suggest that they had any right, or any intent, to stop paying trail commissions on any outstanding annuity Contracts.

### Ohio National Affirms Its Intention To "Continue Paying Full Trail[s]" And Launches Its First Exchange Offer

65.     Around September 2017, representatives from Ohio National visited Raymond James' headquarters in St. Petersburg, Florida, to give a presentation that largely focused on GMIB Riders (the "**GMIB Presentation**").  In Ohio National's own words, one of the initial topics discussed in the GMIB Presentation was that "Economic and regulatory environments have increased cost of existing Income Benefit business."

66.     During the GMIB Presentation, Ohio National disclosed that Contract holders had made over $1 billion in new deposits to existing GMIB Riders.  Ohio National indicated that a new compensation schedule would be effective later that year but affirmed that it would "continue paying full trail on all premium."

67.     Ohio National also used the GMIB Presentation to outline an "Enhanced Exchange Offer" they intended to offer to Raymond James' and other broker-dealers' clients who had purchased Contracts with GMIB Riders.

68.     Following the GMIB Presentation, Raymond James received notice effective November 2017 from Defendants that, beginning on January 2, 2018, Ohio National would offer to exchange a client's Contract containing a GMIB Rider for another Ohio National product without a GMIB Rider (the "**First Offer**").  A copy of the notice is attached as **Exhibit 5**.

69.     To encourage Financial Advisors to recommend that their clients accept the First Offer, Ohio National pointed out that Financial Advisors would benefit from a client's exchange of a Contract containing a GMIB Rider because the exchange would count as a "new sale" for which the Financial Advisor would receive a new commission.  **Exhibit 6** at 3.

70.     In other words, Ohio National dangled the prospect of additional compensation in an attempt to influence Financial Advisors to encourage their clients to participate in the First Offer even if those clients would receive an inferior product just so Ohio National's bottom line could benefit.

71.     Ohio National admitted they would possibly benefit from the exchange:

Ohio National could gain a financial benefit, because, due to regulatory changes and prolonged period of low interest rates, supporting the guarantees associated with the VA contracts and GMIB riders may be more expensive for us than the guarantees associated with the [new contracts].

*Id.* at 3.

72.     On December 1, 2017, Ohio National published the First Offer as a supplement to its May 2017 ONcore variable annuity prospectus.  A copy of the December 1, 2017 supplement ("**2017 Supplement**") is attached as **Exhibit 7**.

73.     The 2017 Supplement cautioned clients that evaluating the financial implications of the proposed exchange could be complicated and, therefore, it was recommended that clients consult with their financial advisor before accepting the First Offer:

> You should consult with your financial professional . . . to discuss factors relevant to your financial needs and retirement goals. We cannot give you any investment advice or recommend whether you should accept this Offer.

*Id.* at 4.

74.     The 2017 Supplement also alerted clients about the incentives provided to broker-dealers and financial advisors as well as the likely benefit to Ohio National if a client accepted the First Offer:

> [Ohio National] could gain a financial benefit from the Offer because . . . supporting the guarantees associated with the Eligible ONcore variable annuities and the Eligible GMIB riders may be more expensive for us than the guarantees associated with the ONdex fixed indexed annuities and the GLWB riders.
> . . .
>
> Your financial professional may receive compensation from his or her broker-dealer due to the exchange. Such compensation may be higher or lower than the compensation they would receive if you did not accept the Offer and maintained your ONcore variable annuity, which may provide them an incentive in recommending whether or not you should accept the Offer. Contact your financial professional for information about the compensation he or she receives.

*Id.* at 11.

75.     The First Offer characterized the financial professional's broker dealer – here, RJA or RJFS - as the origin of the additional compensation that would result from an exchange when in reality such compensation originated and would be ultimately paid by Ohio National.

76.     Ohio National's First Offer was directed at several thousand Raymond James clients.

77.     For many Raymond James clients, the First Offer would not provide the high level of guaranteed income available under the existing GMIB Rider that influenced the initial purchase decision.  As a result, a substantial majority of Raymond James clients eligible for the First Offer declined it.

78.     At no time during the First Offer did Ohio National indicate that it was considering ceasing the payment of trail commissions on existing GMIB Riders.

**The Second Exchange Offer**

79.     After the unsuccessful First Offer, Ohio National decided to make another exchange offer in 2018.  On May 11, 2018, Ohio National published a supplement to its May 1, 2018, ONcore variable annuity prospectuses, again offering to exchange each holder's ONcore Contract with a GMIB Rider for a different product with a different rider (the "**Second Offer**").  A copy of the May 11, 2018, supplement containing the Second Offer is attached as **Exhibit 8**.

80.     The Second Offer's terms stated that it was an "Offer to exchange your ONcore variable annuity with a GMIB rider for an ONdex fixed indexed annuity with a GLWB rider" and that the offer was available from June 4, 2018, to September 7, 2018.  *See* Ex. 8 at 2-3.

81.     In the Second Offer, Ohio National again conceded that it stood to gain a financial benefit from the success of the offer:

> We could gain a financial benefit from the Offer because, due to regulatory changes and a prolonged period of low interest rates, supporting the guarantees associated with the eligible ONcore variable annuities and the Eligible GMIB riders may be more expensive for us than the guarantees associated with the ONdex fixed indexed annuities and the GLWB riders.

*Id.* at 9.

82.     Ohio National also acknowledged that the Second Offer might create a conflict of interest between clients and their advisors:

> Your financial professional may receive compensation from his or her broker-dealer due to the exchange. Such compensation may be higher or lower than the compensation they would receive if you did not accept the Offer and maintained your ONcore variable annuity, which may provide them an incentive in recommending whether or not you should accept the Offer.

*Id.*

83.     Unlike the First Offer that was sent to broker-dealers such as Raymond James, Ohio National created two letters to convey its Second Offer:  one was to Financial Advisors and the other one was sent directly to clients.  A copy of the letter for Financial Advisors ("**Second Offer Representative Letter**") is attached as **Exhibit 9**.

84.     Ohio National's letter for Financial Advisors highlighted the economic incentive for Financial Advisors to counsel their clients to accept the Second Offer: "We value our relationship with you, so please note that this exchange will count as a new sale and compensation will be applied accordingly."  *Id.* at 1.

85.     The Second Offer Representative Letter again stated that the Second Offer was in Ohio National's interest:

> Ohio National could gain a financial benefit, because…supporting the guarantees associated with the VA contracts and the GMIB riders may be more expensive for us than the guarantees associated with the FIA contracts and GLWB riders.

*Id.* at 1.

24

86.     The Second Offer potentially affected a significant number of Raymond James clients.  But once again, a substantial majority of eligible Raymond James clients declined the Second Offer.

87.     At no time during or after the Second Offer did Ohio National tell Raymond James that it was considering ceasing payment of trail commissions on existing Contracts with GMIB Riders.

## **The Buyout Offer**

88.     After two unsuccessful exchange offers in November 2017 and May 2018, Ohio National notified Raymond James on October 24, 2018, that beginning on November 12, 2018, and until February 11, 2019, eligible clients with GMIB Riders would **again** be given the opportunity to cancel their variable annuity Contracts and all attached riders in exchange for an "Enhanced Contract Value" (the "**2018-19 Buyout Offer**").  A copy of Ohio National's notice is attached as **Exhibit 10**.

89.     The 2018-19 Buyout Offer notice states that Ohio National would directly approach clients to notify them of the offer, thereby bypassing Raymond James and the Financial Advisors.  *Id.* at 2.

90.     As an incentive to accept the 2018-19 Buyout Offer, Ohio National agreed to waive "any charges associated with surrender for clients who accept the offer."  *Id.*

91.     The 2018-19 Buyout Offer was yet another effort by Ohio National to pressure Raymond James clients into surrendering their current Contracts with GMIB Riders, in exchange for contracts that are more profitable for Ohio National but do not contain a rider similar to the GMIB Rider and may not be in the clients' interest.

### Defendants Terminate The Raymond James Selling Agreements

92.     Clients holding Contracts with GMIB Riders largely declined to participate in the First Offer, the Second Offer, and the 2018-19 Buyout Offer, presumably because clients felt those proposals were not in their individual best interests.

93.     On September 20, 2018, shortly before launching the 2018-19 Buyout Offer - and without any prior notice to Raymond James - Defendants announced the termination of "any and all selling agreements, as amended" between Ohio National and Raymond James, effective December 12, 2018.  The termination letter stated that Ohio National would provide Raymond James "information . . . about the terms for servicing your clients **after** termination of the selling agreement(s)." (emphasis added).  A copy of the September 20, 2018, termination letters are attached as **Exhibit 11**.

94.     On September 21, 2018, Defendants sent Raymond James a second letter regarding the termination of the 2002 and 2003 Selling Agreements.  The letter stated that "[p]ursuant to your selling agreement, all individual annuity trail compensation under the [Selling Agreements] **will cease at that time**."  (Emphasis added).  The letter attached a proposed Servicing Agreement (the "**Proposed Ohio National Servicing Agreement**,") whereby Ohio National purported to "allow [Raymond James] to continue to service [its] clients with Ohio National contracts."

95.     The September 21, 2018, letter further explained that the Proposed Ohio National Servicing Agreement "provides for a service fee to be paid to you for your clients with Ohio National individual annuity contracts, except for contracts which contain a

Guaranteed Minimum Income Benefit [GMIB] rider."  A copy of the September 21, 2018, servicing agreement letters are attached as **Exhibit 12**.

96.     The Proposed Ohio National Servicing Agreement also contained a provision entitled "Services," stating that "[Raymond James], or its Financial Advisors, shall provide ongoing servicing to holders of the Contracts, where [Raymond James] is broker-of-record and maintains the client account relationship (the 'Services')."  *See* Ex. 12 at 2.

97.     Notwithstanding its contractual obligation in the Selling Agreements and elsewhere to continue to provide Raymond James with policy information for each and every policy placed with Raymond James "unless a change of agent has been requested by the owner(s)," Ohio National advised Raymond James that it now "reserves the right to change the method of providing information" and that it was making such reservation a condition of post-termination servicing rights.

98.     Absent guaranteed continued access to policy information, Raymond James and Financial Advisors with clients that own an Ohio National Contract with a GMIB Rider will face irreparable harm as they work to provide those clients with the full range of wealth management services and advice that they currently provide.

99.     The Proposed Ohio National Servicing Agreement also contains a provision entitled "Compensation for Services," purporting to establish a compensation structure for the services Raymond James would provide to its clients with Contracts without the GMIB Rider. That provision states, in its entirety:

> In exchange for the Services provided under this Agreement, ONL agrees to pay BD [i.e., the "broker-dealer," here Raymond James,] a service fee (the 'Service Fee') equivalent to the compensation provided for in the compensation schedules appended to the Selling Agreement for the

QB\62032163.6

Contracts listed on the schedule attached to this Agreement (the 'Listed Contracts'). The Service Fee shall be paid with respect to the Listed Contracts in accordance with such compensation schedules as in effect at termination of the Selling Agreement. ONL reserves the right to revise the list of Listed Contracts or the Service Fee at any time upon at least thirty (30) days prior written notice to BD. Termination of this Agreement, for any reason, shall also terminate any right of BD to receive future compensation payments from ONL in connection with the Services provided under this Agreement except for the compensation already owed to BD prior to termination of this Agreement. Cancellation of Listed Contract, for any reason, by ONL, BD, or the client, or the removal of BD as broker-of-record for a Listed Contract shall also terminate any right of BD to receive future compensation payments from [ONL/National Security] with respect to such Listed Contract, except for compensation already owed to BD prior to the cancellation of the Listed Contract or removal of BD.

Ex. 12 at 4.

100.    The Schedule of "Listed Contracts" pursuant to which the Proposed Ohio National Servicing Agreement purports to agree to pay Raymond James a service fee "equivalent to the compensation provided for in the compensation schedules appended to the Selling Agreement" contains the following language: "All individual variable annuity contracts; provided, however that any individual contract that, as of the date of this Agreement, includes a guaranteed minimum income benefit rider ('GMIB') is excluded." *See* Ex. 12 at 8, 16.

101.    In essence, Defendants' attempt to use the payment of a "Service Fee" to incentivize Raymond James to forego its rights to receive valuable trail commissions on outstanding Contracts with GMIB Riders that Ohio National was contractually obligated to pay was the final act of Defendants' unsuccessful campaign to avoid their contractual obligations under the Selling Agreements.

28

QB\62032163.6

**Ohio National's Breaches Remain Ongoing**

102.    The premiums paid by Raymond James clients for purchasing Contracts with GMIB Riders were paid directly to Ohio National.

103.    In unilaterally terminating the Selling Agreements, Defendants are simply retaining for themselves that portion of the premium that Raymond James' clients have already paid to Ohio National to be used to compensate Raymond James and its Financial Advisors for their continuing advice regarding outstanding Contracts and associated GMIB Riders, and eliminating trail compensation to Raymond James and the Financial Advisors.

104.    In addition, Defendants' unilateral termination of the Selling Agreements means that Raymond James and the Financial Advisors must continue servicing their clients' Contracts and associated GMIB Riders without compensation that was contractually promised to them when they were given the ability to select the desired commission payment option.

105.    At no time did Ohio National ever disclose to Raymond James or the Financial Advisors that it believed it had the future unilateral right to terminate the payment of trail commissions on GMIB Riders for Contracts that had already been sold to clients.   Had Raymond James or the Financial Advisors been warned that future trail commissions could cease at some point in the future at Ohio National's unbridled discretion, they undoubtedly would have elected to eliminate that risk by selecting the larger up-front commission option.

106.    As a result of Defendants' exclusive focus on their own financial interests, their unilateral decision to stop paying trail commissions will not result in any savings or benefits for Raymond James' clients.

## V.    CAUSES OF ACTION

### COUNT I
### <u>Declaratory Judgment Relief (28 U.S.C. §§ 2201 – 2202)</u>
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc.)**

107.    Raymond James repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

108.    Raymond James requests that this Court declare that: both before and after the termination of the 2002 Selling Agreement and 2003 Selling Agreement, Ohio National is obligated, pursuant to the 2002 Selling Agreement and 2003 Selling Agreement, to pay all trail compensation to Raymond James on all Contracts with GMIB Riders on which Raymond James is listed as the Broker Dealer of Record, and that failure to do so is a breach of the respective selling agreement.

109.    For purposes of this Count, "GMIB Rider" means a product of Ohio National (including without limitation all variable annuities with a Guaranteed Minimum Income Benefit Rider) owned by a Raymond James client and which: (a) was sold pursuant to the 2002 Selling Agreement or 2003 Selling Agreement (Exs. 2, 4); and (b) is in force as of the date Ohio National stopped paying trail commissions to Raymond James. The trail commissions to be paid by Ohio National to Raymond James shall be calculated and paid in the same manner as Ohio National was paying Raymond James immediately prior to the termination of the Selling Agreements.

110.    Given Ohio National's termination of the 2002 Selling Agreement and 2003 Selling Agreement and refusal to pay trail commissions on Contracts with GMIB Riders, there is an actual and justiciable controversy between the parties with regard to this issue.

30

## COUNT II
### Breach of the 2002 Selling Agreement
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc.)**

111.    RJFS repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

112.    RJFS and Ohio National are parties to the 2002 Selling Agreement, which is a binding and enforceable contract.

113.    RJFS has at all times fulfilled its obligations under the 2002 Selling Agreement.

114.    Ohio National is contractually obligated to pay commissions, including trail commissions, to RJFS after its termination of the 2002 Selling Agreement.

115.    Ohio National clearly and unequivocally informed RJFS that it would not pay such commissions to RJFS after the termination of the 2002 Selling Agreement, and it has not paid them after December 13, 2018.  Ohio National's willful failure to comply with its contractual obligations under the 2002 Selling Agreement was without legal excuse when performance was due and constitutes - and continues to constitute - a breach of the 2002 Selling Agreement.

116.    As a direct result of Ohio National's breach and unlawful conduct, RJFS has been and will continue to be damaged and Ohio National is therefore liable to RJFS in an amount to be determined by the Court, together with costs, interest and attorneys' fees as allowable by law.  In addition, RJFS is entitled to specific performance of the terms of the 2002 Selling Agreement by way of injunctive relief.

QB\62032163.6

## COUNT III
### Breach of the 2003 Selling Agreement
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc.)**

117.    RJA repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

118.    RJA and Ohio National are parties to the 2003 Selling Agreement, which is a binding and enforceable contract.

119.    RJA has at all times fulfilled its obligations under the 2003 Selling Agreement.

120.    Ohio National is contractually obligated to pay commissions, including trail commissions, to RJA after its termination of the 2003 Selling Agreement.

121.    Ohio National clearly and unequivocally informed RJA that it would not pay such commissions to RJA after the termination of the 2003 Selling Agreement, and it has not paid them after December 13, 2018.  Ohio National's willful failure to comply with its contractual obligations under the 2003 Selling Agreement was without legal excuse when performance was due and constitutes - and continues to constitute - a breach of the 2003 Selling Agreement.

122.    As a direct result of Ohio National's breach and unlawful conduct, RJA has been and will continue to be damaged and Ohio National is therefore liable to RJA in an amount to be determined by the Court, together with costs, interest and attorneys' fees as allowable by law.  In addition, RJA is entitled to specific performance of the terms of the 2003 Selling Agreement by way of injunctive relief.

QB\62032163.6

## COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc.)**

123.    Raymond James repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

124.    All contracts include an implied covenant of good faith and fair dealing preventing any party from injuring the right of another party to receive the benefit of its bargain.

125.    The 2002 Selling Agreement and the 2003 Selling Agreement each contain an implied covenant of good faith and fair dealing.

126.    Ohio National acted and continues to act without good faith and/or in bad faith and to deprive Raymond James of the fruits of its contracts with Ohio National.

127.    Raymond James has been and continues to be damaged as a proximate cause of Ohio National's breaches of the covenant of good faith and fair dealing.

128.    Raymond James is entitled to damages in an amount to be determined by the Court, together with costs, interest, and attorneys' fees as allowable by law.   In addition, Raymond James is entitled to specific performance of the terms of the 2002 Selling Agreement and the 2003 Selling Agreement and injunctive relief.

## COUNT V
### Tortious Interference with Actual and/or Prospective
### Contractual and Business Relations
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc.)**

129.    Raymond James repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

33

130.    Raymond James has contractual and/or prospective business relations with its clients and prospective clients.

131.    Raymond James has contractual and/or prospective business relations with its Financial Advisors.

132.    Defendants were aware of those contractual and/or prospective business relationships.

133.    Without privilege or justification, Defendants have purposefully and intentionally interfered with, and are continuing to interfere with, those relationships through improper means and/or with improper motive.

134.    Defendants' tortious interference with Raymond James' contractual and/or prospective business relationships has caused and/or will cause damage to Raymond James.

135.    As a consequence thereof, Defendants are liable to Raymond James in an amount to be determined by the Court, together with interest, costs and attorneys' fees as allowable by law, and injunctive relief.

<u>**COUNT VI**</u>
<u>**Unjust Enrichment**</u>
**(Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc.)**

136.    Raymond James repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

137.    Raymond James conferred a benefit on Defendants by selling Defendants' variable annuity products to Raymond James' clients, which generated premiums and other revenues for Defendants.   A portion of those premiums would then be used to pay

compensation, including trail commissions, to Raymond James for its efforts in selling Defendants' variable annuity products to Raymond James' clients.

138.    Defendants encouraged Raymond James to invest its time and financial resources in selling Ohio National's annuities and GMIB Riders, were aware of Raymond James' actions, and knowingly accepted the benefits of Raymond James' actions, including in the form of the premiums and other revenues they received.

139.    Defendants have retained and are continuing to retain that benefit, to Raymond James' detriment, in a manner in which the result is unconscionable by refusing to pay trail commissions to Raymond James on Contracts with GMIB Riders.

140.    Due to these actions, Defendants have been and will continue to be unjustly enriched at the expense of Raymond James.

141.    Defendants are therefore required to make restitution to Raymond James for such unjust enrichment.

142.    As a direct and proximate result of Defendants' unlawful conduct, Raymond James has suffered and will continue to suffer damages.

143.    As a consequence, Defendants are liable to Raymond James in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and injunctive relief.

## COUNT VII
## Injunctive Relief
### (Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, and Ohio National Equities, Inc.)

144.    Raymond James repeats and realleges paragraphs 1-7 and 16-106 as if fully stated herein.

145.    Defendants have no right to cease the payment of trail commissions to Raymond James pursuant to the Selling Agreements which has the effect of harming the goodwill and reputation of Raymond James through interference with relationships created, maintained, and developed by and at the expense of Raymond James with Raymond James' clients.

146.    Unless Defendants are enjoined from the conduct described herein, Raymond James will continue to suffer irreparable harm including loss of goodwill, loss of reputation, and financial losses that are not presently calculable.

147.    The irreparable harm that Raymond James will suffer if injunctive relief is denied outweighs the potential harm (if any) to Defendants if injunctive relief is granted. Raymond James has demonstrated a likelihood of success on the merits and that a balancing of the equities and the public interest favor the issuance of injunctive relief against Defendants.

148.    The injunctive relief that Raymond James seeks would maintain the status quo requiring Defendants to adhere to the 2002 Selling Agreement and 2003 Selling Agreement until the matter can be resolved.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs Raymond James & Associates, Inc., and Raymond James Financial Services, Inc., respectfully request that this Court:

1.    Enter judgment for Raymond James and against Defendants on all Counts;

2.    Order Defendants to pay damages to Raymond James in an amount determined by the Court, including all costs, interest, and attorneys' fees allowed by contract and/or law;

3.    Award injunctive relief permitted by law and equity;

4.       Award prejudgment and post-judgment interest; and

5.       Grant Raymond James such other and further relief as deemed just and equitable.

## **JURY DEMAND**

Raymond James demands a trial by jury on all claims subject to trial by jury.

QUARLES & BRADY LLP


*/s/ Jordan D. Maglich*
Jordan D. Maglich, Esq.
Florida Bar #86106
101 E. Kennedy Blvd., Ste. 3400
Tampa, FL 33602
jordan.maglich@quarles.com
Telephone: (813) 387-0300
Attorneys for Plaintiffs

37